❏ Original          ❏ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>The Cellular Telephone Assigned<br>Call Number (414) 788-6965 | )<br>)<br>)     Case No. 23-965M(NJ)<br>)<br>)<br>) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before August 4, 2023 _____ *(not to exceed 14 days)*
❏ in the daytime 6:00 a.m. to 10:00 p.m.    ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Honorable Nancy Joseph _____ .
*(United States Magistrate Judge)*

☑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❏ for _____ days *(not to exceed 30)*    ☑ until, the facts justifying, the later specific date of          01/17/2024          .

Date and time issued: 7/21/2023 @ 11:59 a.m.          *[signature]*

                                                                  *Judge's signature*

City and state:   Milwaukee, Wisconsin          Honorable Nancy Joseph, U.S. Magistrate Judge
                                                            *Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**<u>ATTACHMENT A</u>**

**Property to Be Searched**

1.      Records and information associated with the cellular device assigned call number **414-788-6965** (referred to herein and in Attachment B as "the Target Cell Phone"), that is in the custody or control of T-Mobile (referred to herein and in Attachment B as the "Service Provider"), a wireless communications service provider that is headquartered at 4 Sylvan Way, Parsippany, New Jersey.

2.      The Target Cell Phone.

# ATTACHMENT B

## Particular Things to be Seized

## I. Information to be Disclosed by the Provider

To the extent that the information described in Attachment A is within the possession, custody, or control of the Service Provider, including any information that has been deleted but is still available to the Service Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Service Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

a. The following subscriber and historical information about the customers or subscribers associated with the Target Cell Phone for the time period **May 27, 2023, to the present:**

   i. Names (including subscriber names, user names, and screen names);

   ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

   iii. Local and long-distance telephone connection records;

   iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

   v. Length of service (including start date) and types of service utilized;

   vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber

2

Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records, and

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Target Cell Phone for the time period May 27, 2023, to the present including:

    a. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

    b. information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received), as well as timing advance or engineering data commonly referred to as per call measurement data (PCMD, RTT, True Call, Advance Timing, Network Event Location Operating System Information (NELOS), WebMap, or equivalent).

b. Information associated with each communication to and from the Target Cell Phone for a period of 30 days from the date of this warrant, including:

i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

ii. Source and destination telephone numbers;

iii. Date, time, and duration of communication; and

iv. All data about the cell towers (i.e., antenna towers covering specific geographic areas) and sectors (i.e., faces of the towers) to which the Target Cell Phone will connect at the beginning and end of each communication, as well as timing advance or engineering data commonly referred to as per call measurement data (PCMD, RTT,

3

True Call, Advance Timing, Network Event Location Operating System Information (NELOS), WebMap, or equivalent).

The Court has also issued an order pursuant to 18 U.S.C. § 3123, dated today, for such information associated with the Target Cell Phone.

c. Information about the location of the Target Cell Phone for a period of 30 days during all times of day and night. "Information about the location of the Subject Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

   i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Service Provider, the Service Provider is required to disclose the Location Information to the government. In addition, the Service Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of the Target Cell Phone on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

   ii. This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## II.   Information to be Seized by the Government

All information described above in Section I that constitutes evidence of violations of Title 21, United States Code, Sections 841(a)(1) and 846, involving Jeremy SHELLEY and others known and unknown from the relevant time period.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency

4

personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>**The Cellular Telephone Assigned**<br>**Call Number (414) 788-6965** | )<br>)<br>)<br>)<br>)<br>)    Case No.23-965M(NJ) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A.

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1) & 846 | Distribution of and possession with intent to distribute controlled substances, and conspiracy to distribute and possess with intent to distribute controlled substances |

The application is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.

☑ Delayed notice of _180_ days *(give exact ending date if more than 30 days:* 01/17/2024 *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

SEAN MAYERBOCK (Affiliate)   Digitally signed by SEAN MAYERBOCK (Affiliate) Date: 2023.07.20 15:18:38 -05'00'

*Applicant's signature*

DEA TFO Sean Mayerbock

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____telephone_____ *(specify reliable electronic means)*.

Date: 7/21/2023

*Judge's signature*

City and state:   Milwaukee, Wisconsin     Honorable Nancy Joseph, U.S. Magistrate Judge

*Printed name and title*

# AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Sean Mayerbock, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number **(414) 788-6965** ("**Target Cell Phone**"), and known to be used by Jeremy SHELLEY, whose service provider is T-Mobile, a wireless telephone service provider ("Service Provider") headquartered at 4 Sylvan Way, Parsippany, New Jersey. The **Target Cell Phone** is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2.     Because this warrant seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the requested warrant is designed to also comply with the Pen Register Act.  *See* 18 U.S.C. §§ 3121-3127.  The requested warrant therefore includes all the information required to be included in an order pursuant to that statute.  *See* 18 U.S.C. § 3123(b)(1).

3.     I am a Detective with the City of Brookfield Police Department and have been a sworn law enforcement officer for over 8 years.  I am currently assigned to the North Central High Intensity Drug Trafficking Area (HIDTA) – Drug Gang Task Force. HIDTA is composed of law enforcement officers from the Milwaukee Police Department

2

(MPD), Drug Enforcement Administration (DEA), Federal Bureau of Investigation (FBI), and several other federal and local law enforcement agencies. Since November 2019, I have been a Task Force Officer with the United States Department of Justice, Drug Enforcement Administration. As such, I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to conduct investigations of and to make arrests for federal felony offenses. As a federal law enforcement officer, I have participated in the investigation of narcotics-related offenses, resulting in the prosecution and conviction of numerous individuals and the seizure of illegal drugs, weapons, stolen property, millions of dollars in United States currency and other evidence of criminal activity.

4.     As a narcotics investigator, I have interviewed many individuals involved in drug trafficking and have obtained information from them regarding acquisition, sale, importation, manufacture, and distribution of controlled substances. Through my training and experience, I am familiar with the actions, habits, traits, methods, and terminology used by the traffickers and abusers of controlled substances. I have participated in all aspects of drug investigations, including physical surveillance, execution of search warrants, undercover transactions, court-ordered wiretaps, analysis of phone and financial records, and arrests of numerous drug traffickers. I have been the affiant on many search warrants. I have also spoken on numerous occasions with other experienced narcotics investigators, concerning the methods and practices of drug traffickers and money launderers. Furthermore, I have attended training courses that specialized in the investigation of narcotics trafficking. Through these investigations, my

training and experience, and conversations with other law enforcement personnel, I have become familiar with the methods used by drug traffickers to manufacture, smuggle, safeguard, distribute narcotics, and to collect and launder trafficking-derived proceeds. I am further aware of the methods employed by major narcotics organizations to thwart any investigation of their illegal activities.

5. This affidavit is based upon my personal knowledge, training, experience, and upon information reported to me by other federal, state, and local law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6. Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation.

7. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 841(a)(1) (distribution and possession with intent to distribute controlled substances) and 846 (conspiracy to distribute an possession with intent to distribute controlled substances) have been committed, are being committed, and/or will be committed by Jeremy A. SHELLEY (DOB: xx/xx/1977). There is also probable cause to believe that the location information described in Attachment B will constitute evidence

of these criminal violations and will lead to the identification of other individuals who are engaged in the commission of these offenses.

8.     The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

9.     In January 2023, the North Central High Intensity Drug Trafficking Area (HIDTA) initiated a drug investigation involving the trafficking of cocaine from Texas and Arizona to Milwaukee, Wisconsin via the United States Postal Service and vehicle transportation.

10.     The investigation to date has included traditional law enforcement methods, including but not limited to: interviews with a confidential source/source of information; information from other law enforcement officers; documentary evidence; telephone toll data; physical and electronic surveillance; and controlled buys of narcotics.

11.     A confidential source, hereinafter referred to as CS-1, identified Jeremy A. SHELLEY as a multi-kilo level cocaine trafficker. CS-1 stated SHELLEY is facilitating the transportation of kilograms of cocaine from Texas and Arizona to Milwaukee, WI and ultimately supplying cocaine to multiple drug trafficking organization (DTO) members within Milwaukee for further distribution. CS-1 provided information that SHELLEY resides in Texas, but frequently travels to Wisconsin to help facilitate the

5

transportation and sales of narcotics from apartments located within 4247 N. 27th Street and 4248 N. 27th Street Milwaukee, WI, which are both multi-unit apartment complexes. Through law enforcement databases, case agents identified an address of 212 W. Pioneer Parkway, Arlington, TX as a current address for SHELLEY, corroborating CS-1's provided information.

12.     CS-1 identified the 4248 N. 27th Street Apartment complex as the location SHELLEY uses to store large amounts of narcotics. 4247 N. 27th Street and 4248 N. 27th Street are directly across the street from each other. Based on CS-1's information, case agents' personal observations, electronic surveillance video, and contact between known targets through verified telephone records, case agents know that the DTO uses multiple apartments in 4247 N. 27th Street and 4248 N. 27th Street to traffic narcotics.

13.     CS-1 identified Kenneth L. ROBY (DOB: xx/xx/1988) as SHELLEY's close associate and SHELLEY's main worker within the DTO. CS-1 informed case agents that ROBY resides in Arizona, but like SHELLEY, frequents Milwaukee to help facilitate the transportation and sales of narcotics in Milwaukee, WI. Through law enforcement databases, case agents identified the address of 11949 W. Alvarado Road, Avondale, AZ as a current listed address for ROBY, further corroborating CS-1's provided information.

14.     CS-1 identified Wendell G. HAMILTON (DOB: xx/xx/1962) as a worker for SHELLEY. CS-1 stated that HAMILTON operates the address of 4247 N. 27th Street Apartment #9 to traffic narcotics that are sourced by SHELLEY. CS-1 informed case agents that narcotics are distributed through this apartment throughout the day and night and has been in operation for multiple years. Since the beginning of this

6

investigation, case agents have conducted a significant number of hours conducting surveillance at 4247 N. 27th Street and have observed HAMILTON on a very regular and consistent basis at this residence. Case agents have further observed, on over 100 occasions, individuals both identified and unidentified entering or being let into the 4247 N. 27th Street apartment complex and exiting after a short duration of time. Based on case agents' training and experience, this type of activity is indicative of drug trafficking.

15. CS-1 has been providing information since January of 2023. The information CS-1 has provided is substantially against CS-1's penal interest. The information provided by CS-1 is consistent with evidence obtained elsewhere in this investigation where CS-1 was not used, and much of CS-1's information has been corroborated through independent investigation, including law enforcement records and toll records. CS-1 is cooperating for consideration relating to potential drug trafficking charges and possession of a firearm by a felon. CS-1 has prior felony convictions for Manufacture/Deliver THC, forgery-uttering, and failure to report to county jail. Finally, CS-1 has had an adequate opportunity to directly observe the events discussed and/or has heard conversations directly from the individuals discussed herein. Within the context of the information detailed and relied upon for purposes of this affidavit, case agents believe CS-1 is credible and CS-1's information reliable.

16. In February of 2023, case agents were notified by DEA Chicago regarding an individual named DeAndrae L. ANDERSON (DOB: xx/xx/1981). Investigators from DEA Chicago seized $19,810 in U.S. currency from ANDERSON as he attempted to fly with the U.S. currency on a one-way ticket from Chicago, IL (ORD) to Los Angeles

7

(LAX). ANDERSON provided consent for investigators to look at the contents within his duffle bag he was traveling with. Upon searching the duffel bag, investigators discovered concealed in clothes, several bundles of rubber banded United States currency. Based upon their training, experience, and familiarity with this investigation, case agents believe that this money constitutes drug proceeds. ANDERSON provided his phone number to investigators as 414-630-1395. This phone number was in contact with multiple numbers believed to be used by various individuals of this DTO, including both SHELLEY and ROBY.

17.    Throughout the course of the investigation, case agents have conducted multiple controlled buys. Based on my training and experience, I know a "controlled buy" is a law enforcement operation in which an informant purchases drugs from the target. The operation is conducted using surveillance, usually audio and video taping equipment, and pre-recorded purchase money. When an informant is used, he/she is searched for contraband, weapons, and money before the operation. The information is also wired with a concealed body recorder and/or a monitoring device. When the transaction is completed, the informant meets case agents at a pre-determined meet location and gives the purchased drugs and the recording/monitoring equipment to the case agents. The informant is again searched for contraband, weapons, and money and then interviewed by the case agents about the drug transaction. A sample of the suspected drugs is then field tested by the case agents for the presence of controlled substances and then placed in inventory pursuant to normal inventory procedures. Unless otherwise noted, the calls to the target by the informants are consensually

8

recorded calls under the direction and control of case agents and made in the presence of case agents. Additionally, case agents observe the informants dial the target's number on each occasion and the contact is verified through telephone records.

18.     In March 2023, case agents conducted a controlled buy of cocaine from HAMILTON using CS-1.  CS-1 contacted the known phone number for HAMILTON, 414-793-2980, and spoke with him over the phone in the presence of investigators. During the phone call, HAMILTON directed CS-1 to come to his residence located at 4247 N. 27th Street and stated he would have someone bring the cocaine out to CS-1. Once CS-1 arrived at 4247 N. 27th Street, CS-1 contacted HAMILTON, who stated someone would bring the cocaine to CS-1. Shortly thereafter, a subject exited HAMILTON's residence and provided CS-1 with an ounce of cocaine. After the conclusion of the controlled buy, CS-1 provided investigators with the suspected ounce of cocaine. The cocaine was later weighed, and field tested, and it received a positive indication for the presence of cocaine and weighed approximately 26.8 grams.

19.     Case agents know through verified telephone records that phone numbers believed to be used by SHELLEY, ROBY, HAMILTON, and other members of the DTO are in high frequency phone contact with one another.  Through law enforcement databases and common contacts via verified telephone records, case agents identified the phone number of 414-807-3467 as a phone number that SHELLEY used. A call/text frequency report for the phone number 414-807-3467 reflected that SHELLEY used this phone number to contact other DTO members. Of note, from the time period of November 21, 2022 through February 24, 2023, SHELLEY had 386 contacts with

9

ANDERSON's known phone number (414-630-1395), 378 contacts with HAMILTON's other identified phone number (414-501-9266), 349 contacts with Damien NELSON's known phone number (DTO member associated with 4248 N. 27th Street) (262-364-4710), 121 contacts with ROBY's known phone number (414-839-4186), 12 contacts with HAMILTON's known phone number (414-793-2980), and multiple other identified DTO members.

20.     On March 30, 2023, a pen register for SHELLEY's phone number of 414-807-3467 was signed and authorized by the Honorable Stephen C. Dries, United States Magistrate of the Eastern District of Wisconsin. Upon executing the pen register, case agents observed a lack of activity on the phone number indicating SHELLEY was no longer using this phone number. Based on their training and experience, case agents know that individuals who sell narcotics will regularly change their phone numbers to avoid law enforcement detection.

21.     During the months of January 2023 through July of 2023 case agents have conducted physical and electronic surveillance in the 4200 block of N. 27th Street. During surveillance, case agents observed SHELLEY accessing both 4247 N. 27th Street and 4248 N. 27th Street on several occasions.

22.     On April 5, 2023, case agents were conducting surveillance in the 4200 block of N. 27th Street and observed SHELLEY exit the front door of 4248 N. 27th Street. SHELLEY then walked westbound across the street, and into HAMILTON's apartment located at 4247 N. 27th Street. A short period of time later, SHELLEY exited 4247 N. 27th Street and walked back across the street to 4248 N. 27th Street, where he used keys to

10

enter the apartment. Case agents obtained digital photographs of SHELLEY unlocking the door of 4248 N. 27th Street. In reviewing these digital photographs, a black pistol magazine is seen protruding from SHELLEY's right pants pocket, with the imprint of the pistol visible through his pants. Case agents know that SHELLEY has been convicted of multiple felonies, to include multiple convictions for Possession with Intent to Deliver Cocaine, and he is therefore prohibited from possessing firearms. *See State of Wisconsin v. Jeremy A. Shelley*, Milwaukee County Case numbers 2004CF001383, 2004CF002532, and 1999CF001528.

23.     On April 10, 2023, case agents were conducting surveillance in the 4200 block of N. 27th Street and observed SHELLEY exit the front door of 4248 N. 27th Street, walk westbound across N. 27th Street, and get into the driver seat of his known vehicle. SHELLEY then drove away in his known vehicle.

24.     On May 20, 2023, case agents reviewed electronic surveillance of the 4200 block of N. 27th Street and observed SHELLEY's known vehicle on the west side of the street in front of 4247 N. 27th Street. SHELLEY exited his vehicle and walked toward the front of 4248 N. 27th Street. Several minutes later an unknown subject approached his vehicle, opened the trunk and retrieved a large black bag prior to running back in the direction of 4248 N. 27th Street. SHELLEY then got back into the driver seat of his vehicle and left the area.

25.     In May 2023, case agents coordinated and conducted a controlled buy with CS-2 for cocaine out of 4247 N. 27th Street. CS-2 indicated that CS-2 was let into the main door of the apartment complex by an unknown black male and CS-2 proceeded to walk

to Apartment #9 and were let in by an individual CS-2 knows as "James." Case agents know two individuals by the name of "James" that are close associates and workers for HAMILTON and SHELLEY: James ROSS (DOB: xx/xx/1972) and James DYSON (xx/xx/1964). CS-2 stated that "James" was in possession of a firearm. CS-2 stated that HAMILTON was not initially present however, HAMILTON walked into the apartment while CS-2 was already inside of the apartment. CS-2 inquired about purchasing pills and heroin. CS-2 was told that they (referring to subjects working in 4247 N. 27th Street) could get heroin if given advance notice. HAMILTON provided CS-2 with the cocaine that was later turned over to case agents. Once turned over to case agents, the suspected cocaine purchased by CS-2 was tested, and the substance received a positive indication for the presence of cocaine.

26. Investigators met with CS-2 after the conclusion of the controlled buy. At this time, CS-2 indicated the apartment at 4247 N. 27th Street is in operation 24-7 with different individuals working different shifts. CS-2 stated that when inside of the apartment, subjects are instructed not to touch any doorknobs. According to CS-2, there is always a doorman, gunman, and at least one person aside from HAMILTON serving people. CS-2 has seen what CS-2 estimated to be a kilogram amount of crack cocaine separated into ounces laid out on a large baking sheet inside of the apartment. CS-2 also observed approximately 20 pounds of marijuana inside of the apartment. CS-2 indicated that if a drug customer purchases a larger amount of cocaine, HAMILTON is the one to facilitate the deal. Smaller amounts are sold by other subjects who work for HAMILTON inside of the apartment.

12

27.     CS-2 has been providing information to investigators since 2022. The information CS-2 has provided is substantially against CS-2's penal interest. The information provided by CS-2 is consistent with evidence obtained elsewhere in this investigation where CS-2 was not used, and much of CS-2's information has been corroborated through independent investigation, including law enforcement records and toll records. CS-2 is cooperating for consideration relating to potential Possession with Intent to Deliver Cocaine and possession of a firearm by a felon charges. CS-2 has provided information on more than two occasions that led to search warrants and the arrest of two or more subjects. CS-2 has one prior felony conviction for Substantial Battery and three misdemeanor convictions, two for Disorderly Conduct and one for Possession of THC. Finally, CS-2 has had an adequate opportunity to directly observe the events discussed and/or has heard conversations directly from the individuals discussed herein. Within the context of the information detailed and relied upon for purposes of this affidavit, case agents believe CS-2 is credible and CS-1's information reliable.

28.     In May 2023, case agents identified a new phone number of 414-397-6216 believed to be used by SHELLEY. Case agents identified this phone number through a common call analysis and specifically, this phone number had common contacts with multiple members of the DTO and contacts with multiple members of SHELLEY's family. Based upon a call/text frequency report for the phone number of 414-397-6216, from the time period of May 9, 2023, through May 29, 2023, SHELLEY had 105 contacts with Kenya BOLDEN (414-712-1712), who investigators know to have been in a

13

relationship with SHELLEY, 47 contacts with ROBY's known phone number (414-839-4186), 30 contacts with HAMILTON's known number (414-793-2980), and multiple other identified DTO/family members.

29. On June 2, 2023, a pen register for SHELLEY's phone number of 414-397-6216 was signed and authorized by the Honorable Stephen C. Dries, United States Magistrate of the Eastern District of Wisconsin. Upon executing the pen register, case agents again observed a lack of activity on the phone number indicating SHELLEY was no longer using this phone number.

30. In June 2023, case agents reviewed phone tolls of identified phone numbers within this DTO to locate a new cell phone number for SHELLEY, as there was a significant drop of activity since June 5, 2023, on 414-397-6216. Investigators located the phone numbers of **414-788-6965** (herein referred to as the **Target Cell Phone**) and 414-788-6966 on the phone tolls of Kenneth ROBY (414-839-4186). Investigators submitted administrative subpoenas for the **Target Cell Phone** and 414-788-6966. Upon receiving the results no subscriber information was listed for either number. Based on their training and experience, case agents know that some drug traffickers do not supply subscriber information for phone numbers to evade law enforcement detection. Queries of the phones toll information reflected that the accounts for both phone numbers were created on May 27, 2023, and both numbers started communicating with SHELLEY's known family members on this same date. A common contact analysis was conducted, which revealed the following data:

      a. **Target Cell Phone** - 31/71 contact numbers are common contacts with the previously known 414-397-6216 phone number. Additionally, of the

14

993 communications since May 27, 2023, 82% have been with common contacts of the 414-397-6216 phone number.

b. 414-788-6966 - 26/48 contact numbers are common contacts with the previously known 414-397-6216 phone number. Additionally, of the 434 communications since May 27, 2023, 77% have been with common contacts of the 414-397-6216 phone number.

c. Lastly, the common contacts include several known members of the DTO in Milwaukee and Texas along with multiple members of SHELLEY's family.

31.    On June 22, 2023, a pen register for the **Target Cell Phone** was signed and authorized by the Honorable Stephen C. Dries, United States Magistrate of the Eastern District of Wisconsin.

32.    On July 13, 2023, case agents reviewed the pen data on the **Target Cell Phone** from July 3, 2023, through July 13, 2023, and observed multiple completed phone calls from the Milwaukee County Jail. Case agents obtained access to the completed jail calls to the **Target Cell Phone** from July 4, 2023, through July 13, 2023. All of the phone calls came from Shankeya M. MCDONALD (DOB: xx/xx/1996), who case agents believe to be in a relationship with SHELLEY based upon the content of their communications.

33.    On June 27, 2023, MCDONALD was arrested after her two-year-old child shot him/herself in the arm at 4248 N. 27th Street Apt # 8 with a firearm that was inside of the residence (4248 N. 27th Street is a main residence identified within this DTO). MCDONALD was not forthcoming with information to investigators and stated the children were playing in the back bedroom and she was in the front of the residence waiting for her sister.  MCDONALD did not provide police with the incident location for several hours. MCDONALD was taken into custody on charges that were ultimately

15

dropped. However, MCDONALD was on probation at the time and remained in jail custody.

34.     Case agents listened to the jail phone calls from MCDONALD to the **Target Cell Phone.** On July 7, 2023, at 6:58 p.m., during a conversation between MCDONALD and SHELLEY, MCDONALD stated that she does not like when SHELLEY does not answer his phone in the morning when he is "at that house at night." SHELLEY agrees and informs MCDONALD he does not like going to this location, and MCDONALD proceeds to tell him to not go there. SHELLEY said to MCDONALD, "Me driving those backroads at that time of night, that ain't good." MCDONALD responded saying, "who says you have to do that at night? Why would you go out there at night?" SHELLEY replied, "Oh you want me to go out there and do all this…" SHELLEY proceeded to stop himself and say, "Ah no you trying to baby check me too hard." Based on their training, experience, and familiarity with this investigation, case agents believe that when MCDONALD referenced "that house," she was referring to either 4247 or 4248 N. 27th Street because there is high likelihood of law enforcement intervention due to drug activity at these locations or violence due to the dangerous nature of drug trafficking. When SHELLEY referenced taking back roads at night, case agents believe SHELLEY was referring to wanting to avoid law enforcement detection by staying off of main thoroughfares. Additionally, when SHELLEY stopped himself after saying "Oh you want me to go out there and do all this…", case agents believe SHELLEY stopped himself from saying something of criminal nature over a recorded phone call.

35. Later in the conversation, MCDONALD and SHELLEY began to talk about "Kenya." Case agents know SHELLEY was in a past relationship with Kenya BOLDEN. In the conclusion of the phone call, MCDONALD informed SHELLEY that she needed money on her account. SHELLEY proceeded to tell her he is going to send "Tone" down to the jail to bring $200 or $300. Case agents observed that on June 30, 2023, Anthony HOWELL (DOB: xx/xx/1961) put $200 on MCDONALD's account. Case agents know that HOWELL is a close associate to SHELLEY and goes by the name "Tone."

36. On July 7, 2023, at 8:33 p.m., during a conversation between MCDONALD and SHELLEY, using **Target Cell Phone**, SHELLEY told McDonald that he is not going to be here all the time. MCDONALD inquired about what SHELLEY was talking about. SHELLEY told MCDONALD to hold on because "Wood" is calling him. Case agents know "Wood," "Kenwood," "KD," and "Kenny" are ROBY's nicknames. Before SHELLEY could further explain what he was talking about, the phone call ended. MCDONALD called the **Target Cell Phone** back at 8:37 p.m., and SHELLEY answered. SHELLEY told MCDONALD she should have called right back and MCDONALD informed SHELLEY that she gets confused regarding his phone numbers. SHELLEY then yelled MCDONALD for forgetting his phone numbers. MCDONALD asked SHELLEY if his number is "6965" or "6569." SHELLEY then yelled at someone in the background of the call and said, "you better give him that money too." In the phone call there are people yelling in the background and SHELLEY continues talking to the individuals in the background and stated, "That's Wood right there." SHELLEY continued going back and forth between talking with MCDONALD and the individuals

in the background. SHELLEY told an individual in the background "give Wood the money, where the money at? Give it to Kenny, then go upstairs, just give him the money man, that's it, then take them upstairs." The next portion of the call is unclear; however, it sounds as though an individual asked about the location upstairs, and SHELLEY responded by stating that it was up by the bed. MCDONALD got upset with SHELLEY and informed him that she was going to be locked in. SHELLEY apologized and said, "I know but I still gotta get this paper." Based on their training, experience, and familiarity with this investigation, case agents believe that SHELLEY told MCDONALD that he still needed to deal with the money, and that earlier in the call, SHELLEY was directing another individual to find the money and give it to "Wood." Case agents further believe that the money SHELLEY is referring to constitutes drug proceeds.

37.    SHELLEY continued talking to the individuals in the background; however, communications were unclear. SHELLEY continued talking with MCDONALD and told her, "I got a lot of stuff that outta be good over the next few days [unable to understand the rest of statement]." Based on their training, experience, and familiarity with this investigation, case agents believe that SHELLEY is referring to a drug-related function benefiting the DTO.

38.    On July 12, 2023, at 6:12 p.m., during a conversation between MCDONALD and SHELLEY, using the **Target Cell Phone,** SHELLEY answered the call and was upset with MCDONALD about which phone number she called. MCDONALD informed SHELLEY that she called the right phone and that she called the "788" number three times and then the "630" number five times. Case agents are aware of the phone

number 414-630-1395 being used by this DTO, as ANDERSON provided this phone number to investigators during the seizure of U.S. currency in February 2023 as previously described. Case agents received access to jail phone calls made to 414-630-1395 in the month of July and observed multiple jail phone calls from MCDONALD to this number. Law enforcement databases reflects that the phone number 414-630-1395 listed Jeremy SHELLEY at the address 204 West Pioneer Pkwy Arlington, TX. Case agents listened to the jail phone calls from MCDONALD to 414-630-1395. A comparison of jail calls on both numbers lead case agents to believe that the user of 414-630-1395 had the same voice as the user of the **Target Cell Phone**. Furthermore, in listening to the jail phone calls between MCDONALD and 414-630-1395, MCDONALD referred to the user as "Jeremy SHELLEY" in one phone call and "Boo" on multiple separate phone calls. Case agents know that SHELLEY's nickname is "Boo." Based on jail phone calls, case agents believe SHELLEY is in control of the **Target Cell Phone** and 414-630-1395.

## CONCLUSION

39. Evidence obtained during this investigation leads case agents to believe that SHELLEY operates the **Target Cell Phone**. The location data associated with the **Target Cell Phone** will assist case agents in conducting targeted physical surveillance and further identify the locations and individuals associated with and the nature and scope of SHELLEY's drug trafficking activities.

40. Case agents searched law enforcement databases to confirm that **Target Cell Phone** is currently being serviced by T-Mobile.

41. Case agents are requesting this warrant authorizing the initial collection of

data related to the **Target Cell Phone** for **30** days to further investigate SHELLEY's activities, and to identify locations to which SHELLEY is traveling to further his drug distribution trafficking activities.

42.     Based upon my training and experience, I know that individuals involved in drug trafficking use their cellular telephones to contact other drug dealers and drug purchasers, and that information relating to their telephones may show the areas in which they are trafficking drugs and the individuals who they are contacting to sell or distribute the drugs. Based upon the facts in this affidavit, there is probable cause to believe that SHELLEY is engaged in the trafficking and distribution of controlled substances and is using the **Target Cell Phone** while engaged in these crimes. I further submit that probable cause exists to believe that obtaining the location information of the **Target Cell Phone** will assist case agents in determining SHELLEY's criminal activities, to include meeting locations, co-conspirators, and sources of supply.

43.     In my training and experience, I have learned that the Service Provider is a company that provides cellular communications service to the general public. I also know that providers of cellular communications service have technical capabilities that allow them to collect and generate information about the locations of the cellular devices to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular device and, in some cases, the "sector" (i.e., faces of the towers) to which the device connected. These towers are often a half-mile or more apart, even in urban areas,

20

and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate general location of the cellular device.

44.     Based on my training and experience, I know that T-Mobile can also collect timing advance or engineering data commonly referred to as per call measurement data (PCMD, RTT, True Call, Advance Timing, Network Event Location Operating System Information (NELOS), WebMap, or equivalent).

### Cell-Site Data

45.     Based on my training and experience, I know that the Service Provider can collect cell-site data on a prospective basis about the **Target Cell Phone**. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer was connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as the Service Provider typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

46.     Based on my training and experience, I know that T-Mobile also can collect per-call measurement data, which T-Mobile also refers to as WebMap. RTT data

estimates the approximate distance of the cellular device from a cellular tower based upon the speed with which signals travel between the device and the tower. This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

### E-911 Phase II / GPS Location Data

47.    I know that some providers of cellular telephone service have technical capabilities that allow them to collect and generate E-911 Phase II data, also known as GPS data or latitude-longitude data. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. As discussed above, cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise than E-911 Phase II data. Based on my training and experience, I know that the Service Provider can collect E-911 Phase II data about the location of the **Target Cell Phone**, including by initiating a signal to determine the location of the **Target Cell Phone** on the Service Provider's network or with such other reference points as may be reasonably available.

22

## Subscriber Information

48.     Based on my training and experience, I know that wireless providers such as the Service Provider typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service. I also know that wireless providers such as the Service Provider typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the **Target Cell Phone**'s user or users and may assist in the identification of co-conspirators and/or victims.

## AUTHORIZATION REQUEST

49.     Based on the foregoing, I request that the Court issue the proposed warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

50.     I further request that the Court direct the Service Provider to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.

51.     I also request that the Court direct the Service Provider to furnish the government all information, facilities, and technical assistance necessary to accomplish

the collection of the information described in Attachment B unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of the Target Cell Phone on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

52. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until **180 days** after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the **Target Cell Phone** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

24

53.     Because the warrant will be served on the Service Provider, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night. I therefore request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the **Target Cell Phone** outside of daytime hours.

Case 2:23-mj-00965-NJ     Filed 07/21/23     Page 32 of 38     Document 1

## ATTACHMENT A

### Property to Be Searched

1.      Records and information associated with the cellular device assigned call number **414-788-6965** (referred to herein and in Attachment B as "the Target Cell Phone"), that is in the custody or control of T-Mobile (referred to herein and in Attachment B as the "Service Provider"), a wireless communications service provider that is headquartered at 4 Sylvan Way, Parsippany, New Jersey.

2.      The Target Cell Phone.

<u>**ATTACHMENT B**</u>

**Particular Things to be Seized**

I. **Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Service Provider, including any information that has been deleted but is still available to the Service Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Service Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

    a. The following subscriber and historical information about the customers or subscribers associated with the Target Cell Phone for the time period **May 27, 2023, to the present:**

        i. Names (including subscriber names, user names, and screen names);

        ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

        iii. Local and long-distance telephone connection records;

        iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

        v. Length of service (including start date) and types of service utilized;

        vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

1

vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records, and

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Target Cell Phone for the time period May 27, 2023, to the present including:

a. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

b. information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received), as well as timing advance or engineering data commonly referred to as per call measurement data (PCMD, RTT, True Call, Advance Timing, Network Event Location Operating System Information (NELOS), WebMap, or equivalent).

b. Information associated with each communication to and from the Target Cell Phone for a period of 30 days from the date of this warrant, including:

i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

ii. Source and destination telephone numbers;

iii. Date, time, and duration of communication; and

iv. All data about the cell towers (i.e., antenna towers covering specific geographic areas) and sectors (i.e., faces of the towers) to which the Target Cell Phone will connect at the beginning and end of each communication, as well as timing advance or engineering data commonly referred to as per call measurement data (PCMD, RTT, True Call, Advance Timing, Network Event Location Operating System Information (NELOS), WebMap, or equivalent).

The Court has also issued an order pursuant to 18 U.S.C. § 3123, dated today, for such information associated with the Target Cell Phone.

2

c. Information about the location of the Target Cell Phone for a period of 30 days during all times of day and night. "Information about the location of the Subject Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

    i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Service Provider, the Service Provider is required to disclose the Location Information to the government. In addition, the Service Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of the Target Cell Phone on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

    ii. This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## II.    Information to be Seized by the Government

All information described above in Section I that constitutes evidence of violations of Title 21, United States Code, Sections 841(a)(1) and 846, involving Jeremy SHELLEY and others known and unknown from the relevant time period.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

3

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by T-Mobile, and my title is _____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of T-Mobile. The attached records consist of _____.

I further state that:

a.      All records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of T-Mobile and they were made by T-Mobile as a regular practice; and

b.      Such records were generated by T-Mobile's electronic process or system that produces an accurate result, to wit:

1.      The records were copied from electronic device(s), storage medium(s), or file(s) in the custody of T-Mobile in a manner to ensure that they are true duplicates of the original records; and

2.      The process or system is regularly verified by T-Mobile and at all

1

times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____     _____
Date                                 Signature